## TILLER, et al. v. NORTON, et al.

No. 7770.   Decided February 20, 1953.   (253 P. 2d 618.)

See 34 C. J. S., Executors and Administrators, sec. 528. Duty of Executor to locate beneficiaries. 21 Am. Jur., Executors and Administrators, sec. 226; 39 A. L. R. 329.

*W. D Beatie,* Salt Lake City, for appellants.

*Shields & Shields, R. Verne McCullough, John D. Rice* and *McKay, Burton, McMillan & Richards,* Salt Lake City, for respondents.

HENRIOD, Justice.

Appeal by 2 adult children of Charles Carson, deceased, from a dismissal of their action against Norton, administrator, which action attacked the decree of distribution in which plaintiffs were not included as distributees, and which action was predicated on the theory that Norton was guilty of extrinsic fraud by failing to disclose information

as to the existence and whereabouts of the plaintiff heirs. The judgment is affirmed, the parties to bear their own costs on appeal.

Plaintiffs assign 11 grounds for reversal. We consolidate and condense them as follows: 1) That the evidence fails to establish Grace Carson as Charles Carson's widow; 2) that Norton conspired with Grace to deceive the court by failing to disclose information anent the existence and whereabouts of plaintiffs, thus preventing them from asserting claims as heirs; 3) that Norton wilfully failed to search diligently for the plaintiffs; 4) that no legal notice was given either to creditors or heirs; and 5) that Norton converted $300 of estate assets.

The voluminous record contains contradictory but sufficiently satisfactory evidence of marriage to preclude us from saying that the lower court erred by arbitrarily and capriciously finding widowhood, particularly in view of the strong presumption favoring marriage and negativing concubinage, requiring considerably more convincing evidence to attack than ordinarily is required.[1]

We believe the record reflects no conduct amounting to extrinsic fraud calling for relief. There is not that quality of clear, convincing evidence required by the authorities proving that Norton, by word or silence, prevented plaintiffs from asserting any claim.[2] We believe that plaintiffs' burden of establishing extrinsic fraud was not met, as did the trial court.

A local physician, to protect a $25 claim, petitioned for and obtained appointment of Tracy-Collins Trust Co. as special administrator. Grace Carson, claiming as widow, protested, filed a petition of her own, and asked the appointment of Norton as general administrator. Tracy-Col-

[1]*In re Pilcher's Estate*, 1948, 114 Utah 72, 197 P. 2d 143.
[2]*U. S.* v. *Throckmorton*, 1890, 98 U. S. 61, 25 L. Ed. 93.

lins administered the estate for more than 8 months and Norton who finally was appointed general administrator, administered the estate until it was distributed about 5 months later.

During the time Tracy-Collins handled the estate, several hearings were had, attended by Norton. After a number of continuances, granted for the purpose of searching for plaintiffs, whose possible existence was suggested by fragmentary bits of evidence found among Carson's effects, the court finally found Grace Carson to be the sole heir. The trust company, by the Court's instruction, had conducted an extensive search by correspondence, although only $25 was allowed for the purpose. A casual reading of the record impresses us that the trust company performed services of far greater value than the allowance reflects, pursuing every possible clue to a dead end. Carson himself had made one trip to Chicago and South Dakota a year before he died, in a fruitless search for his children. He also had employed Barclay & Barclay, lawyers, to conduct what appears to have been an exhaustive but unsuccessful search, for which they were paid a substantial fee. Plaintiff's own able counsel, then attorney for the trust company, also made an earnest and diligent effort to locate plaintiffs. Norton made inquiry of local neighbors and friends of Carson, and called a relative in Ohio, with no leads.

Difficulty in locating plaintiffs seems to have stemmed, not from Norton's fraudulent non-disclosure, but from a congenital weakness on the part of Carson and his kinfolk to adopt aliases. In 1899 Carson took a wife as "Tiller." By 1910 he was "Swann", which name accompanied him to Dakota as a homesteader and to Chicago as a divorcee. Later he appeared in Salt Lake City with the appellation "Carson", which followed him to the grave in 1948. His son was a "Swann" in Dakota, but some time after his parents' estrangement, he assumed the name "Tillier", closely resembling the old family name of "Tiller". Carson's daughter married one Molinari, divorced him, married one Pelli-

grini, divorced him and re-adopted the name Molinari. Off and on over the years she had used the names Allen, Pelligrini, Manners, Pelli, Russo, Wood and Gordon.

After 1926 Carson never saw, sought out or heard of his children, until 1947 when he made a trip East to locate them. The affection for them which he possessed or lacked was of reciprocal intensity, since the latter never saw, sought out, or heard of him, until 1947 when the son inquired of a Dakota official if Carson still had property there, receiving an answer in the negative, and that Carson's whereabouts was unknown.

Under such circumstances, hardly can it be said that a representative of Carson's estate easily could have located the members of this peripatetic, name-changing family. After the trust company, Barclays, Norton and counsel for the trust company had searched in vain, and Carson himself had made a special trip to find his children, and after the probate had been continued several times, the estate finally was distributed to Grace Carson's executor, Grace having died during the probate. Norton was beneficiary under her will, and he petitioned for distribution of Carson's estate only a month after Grace's death, which inferentially might indicate that self-interest could have induced Norton to withhold information that would assure him of his good fortune. But such inference would be predicated upon an assumption of dishonesty which we cannot indulge.

It seems clear that although Norton may not have possessed the sterling qualities of perseverance possessed by some, nor the ability or inclination of others to ferret out aliased heirs, there is no evidence that he failed to disclose information not already known to the court. ■ It is not beyond reason to believe he may have concluded that if a reputable trust company, its attorney, independant attorneys, and Carson himself could not locate the children, there was little else he could do. At least, the record fails to show that type of non-diligence that would

brand Norton with the mark of extrinsic fraud. Furthermore, the authorities impose on an administrator no particular duty of arduousness in seeking out heirs, but rather require only that he take possession of the assets, preserve and account for them, administer them and distribute them as trustee of the estate[3] under the supervision and direction of the court[4] to those distributees whom the court, at some time during the administration, has found from the evidence to be entitled thereto.[5]

Counsel for plaintiffs conceded that the probate court in this case had jurisdiction to determine heirship, and that if the evidence presented clearly did not establish fraud, plaintiff's cause was lost. Under the facts and the authorities we cannot say that the trial court erred in concluding there was no such fraud, although we are constrained to believe and to note that the probate well might have been deferred by the court a little longer in this case in the hope that what happened would happen,—the appearance of the children, who became the unwilling victims of a damnum absque injuria. The rule that leads us rather rarely to such unhappy result and which makes heirship and entitlement res judicata, once the court has acquired jurisdiction, followed by distribution not vulnerable to attack for fraud, mistake or the like, is based nevertheless on sound principles which look to the early settlement of litigation, lest protraction create more frequently for others the very kind of injustice visited upon the plaintiffs here.[6]

The question of legal notice to creditors and heirs which we believe satisfied statutory requirements, needs no treat-

---

[3]*In re Dryden's Estate*, 1952, 155 Neb. 552, 52 N. W. 2d 737.

[4]*In re Black's Estate*, 1923, 30 Wyo. 55, 216 P. 1059; 2 Bancroft's Probate Practice, 2d Ed., p. 282, § 334; *In re Stevens' Estate*, 1942, 102 Utah 255, 130 P. 2d 85.

[5]*In re Stevens' Estate*, supra; *Child* v. *District Court*, 1932, 80 Utah 243, 14 P. 2d 1110.

[6]*Snyder* v. *Murdock*, 1903, 26 Utah 233, 73 P. 22.

ment, since plaintiffs acknowledged the jurisdiction of the court, admitting that upon failure to prove extrinsic fraud, their case would fail. The evidence as to an alleged conversion was conflicting and such that the trial court's conclusion is sustainable.

McDONOUGH, CROCKETT and WADE, JJ., concur.

WOLFE, Chief Justice (concurring).

I concur in the finding that the district court, having jurisdiction of the action for extrinsic fraud, properly dismissed that action. I agree with the observation of Mr. Justice HENRIOD

"that probate well might have been deferred a little longer in this case in the hope that what happened would happen—the appearance of the children * * *."

In a case where it is known that there was a child or children, a sum equal to their share should have been placed in savings or in trust with a reliable institution in order to permit continued search at reasonable expense of their whereabouts, to be charged against the fund. This is the English practice. These children not having been heard from by those who might be expected to hear from them (which would encompass the father) were subject to the rebuttable presumption of death. But their children, if any survived, might have been living and the presumption that they were dead not indulgeable. While I cannot impute to Norton or the supposed widow dishonest or ulterior motives because of the presumption of good faith which attends them, I incline to the belief that the diligence used in this case was not reasonably adequate or appropriate to the occasion or to its importance as advocated in the concurring opinion filed in the case of *Parker* v. *Ross,* 117 Utah 417, 217 P. 2d 373.

I think it unfortunate that these children suffered the loss of their patrimony to the heirs of a woman in respect

to whom there was doubt as to her marital and widow status —and this in spite of what seems a tenuous filial devotion reciprocated by the father. Even under those circumstances the imagination of the probate court should have been sufficiently awakened to cause him to sense the disappointment which these children would justly feel upon learning of the consequences of his too hasty action. Simple and available administration procedure pending continued search would have saved them the loss of their property which furnished a windfall to strangers. Damnum absque injuria arises here because of the hasty action of the probate court.